# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-00248-COA

**RODOLFO McCANDLESS FALCON, IV A/K/A**          **APPELLANT**
**RODOLFO M. FALCON A/K/A RUDY FALCON**

**v.**

**STATE OF MISSISSIPPI**          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/10/2018 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN III |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/18/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1. Following a jury trial, Rudy Falcon was convicted of selling methamphetamine. On appeal, Falcon argues that the trial judge abused his discretion by admitting Facebook messages between Falcon and a police informant because the messages were not properly authenticated, i.e., because there was insufficient evidence that Falcon sent and received them. We hold that the trial judge did not abuse his discretion. Therefore, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On September 21, 2017, Investigator Greg Jones and other members of the Pearl

Police Department arrested Jason Baker and his son, Brandon Sumrall, on charges related to the possession and sale of controlled substances. At the jail, Baker approached Jones and offered "to make a buy" from Baker's friend Rudy Falcon in exchange for leniency for him and his son. In Jones's presence, Baker contacted Falcon via Facebook Messenger, and Falcon responded immediately. Their conversation was as follows:[1]

| Baker: | Hey bro can i holla at u need a ball.[2] |
|---|---|
| Falcon: | Where you been |
| Baker: | Ive been at work wht u mean where i been |
| Falcon: | I aint heard from you in a few days |
| Baker: | Been busy fool |
| Baker: | So whts up is it cool to swing by |
| Falcon: | Come by and check out my new speakers |
| Baker: | Wht kind u gt bro |
| Falcon: | Powerbass |
| Baker: | Nev heard of it is it worth a shit |
| Falcon: | Hell yea |
| Baker: | Thts whts up ill b there shortly |

¶3.     After the Facebook exchange, Jones searched Baker, gave him $120 and a watch equipped with a video camera, and drove him to Falcon's house. They arrived at Falcon's house within about twenty minutes of the Facebook conversation. Baker knocked on the door, and a man named Mark answered and let him in. Falcon was sitting down inside. A woman named Tammy was also present.

---

[1] At trial, the State offered a series of photographs of Baker's phone that showed the exchange. Falcon objected and argued that the messages could not be properly authenticated because there was insufficient evidence that he sent or received them. Outside the presence of the jury, Baker was examined and cross-examined on the subject. The trial judge then overruled Falcon's objection and admitted the photos of the exchange.

[2] Baker testified that "a ball" is an "eight-ball of methamphetamine" or about 3.5 grams of methamphetamine.

2

¶4.    In the video taken by Baker's watch, which was admitted into evidence, Baker asks Falcon about the speakers Falcon "wanted him to look at." Falcon's response is inaudible. Baker testified that Falcon showed him the speakers, though the video does not show it. Baker also testified that Falcon poured methamphetamine onto a digital scale, measured an eight-ball, and sold it to him for $120. The video does not depict an actual hand-to-hand transfer, and there is no discussion about drugs. Baker testified that the video shows Falcon pouring methamphetamine from a bag and holding a digital scale, but the video is less than clear. Baker left Falcon's house about three minutes after he arrived and walked straight back to Jones's car. Baker had a clear plastic bag containing approximately 3.44 grams of methamphetamine, i.e., an eight-ball.

¶5.    Falcon was indicted, as a second or subsequent drug offender and nonviolent habitual offender,[3] for the sale of (Count I) and conspiracy to sell (Count II) more than two grams but less than ten grams of methamphetamine. *See* Miss. Code Ann. § 41-29-139(a)(1), (b)(1)(B) (Rev. 2018); Miss. Code Ann. § 97-1-1(3) (Rev. 2014). The jury found Falcon guilty of both counts. On Count I, the court sentenced Falcon to serve forty years in the custody of the Department of Corrections as a nonviolent habitual offender but ordered the Department to release him to post-release supervision after he had served thirty years. On Count II, the court sentenced Falcon to a concurrent term of twenty years as a nonviolent habitual offender. Falcon filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.

---

[3] *See* Miss. Code Ann. § 41-29-147 (Rev. 2018); Miss. Code Ann. § 99-19-81 (Supp. 2019).

3

**ANALYSIS**

¶6.    On appeal, Falcon raises only one issue: whether the trial court erred by admitting the Facebook messages because the messages were not properly authenticated under Mississippi Rule of Evidence 901. "Whether the evidence presented satisfies [Rule 901] is a matter left to the discretion of the trial judge. His decision will be upheld unless it can be shown that he abused his discretion." *Ragin v. State*, 724 So. 2d 901, 903 (¶7) (Miss. 1998).

¶7.    "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence *sufficient to support a finding* that the item is what the proponent claims it is." M.R.E. 901(a) (emphasis added). Thus, under Rule 901, "[a] party need only make a prima facie showing of authenticity, not a full argument on admissibility. Once a prima facie case is made, the evidence goes to the jury *and it is the jury who will ultimately determine the authenticity of the evidence, not the court*." *Garcia v. State*, No. 2017-DP-00504-SCT, 2020 WL 2487383, at *20 (¶94) (Miss. May 14, 2020) (emphasis added) (quoting *Walters v. State*, 206 So. 3d 524, 535 (¶32) (Miss. 2016)) (motion for rehearing pending). "In other words, the [proponent of the evidence is] not required to rule out all possibilities inconsistent with authenticity." *Id.* (quotation marks omitted). "The only requirement is that there has been substantial evidence from which [the jury] could infer that the [evidence] was authentic." *Young v. Guild*, 7 So. 3d 251, 262 (¶36) (Miss. 2009) (quoting *Sewell v. State*, 721 So. 2d 129, 140 (¶60) (Miss. 1998)).

¶8.    Evidence can be authenticated in a number of different ways. Rule 901 lists nine specific "examples" of viable methods of authentication, but it also makes clear that those

4

are "examples only" and "not a complete list." M.R.E. 901(b). Relevant to this case, our Supreme Court has stated that "a prima facie showing of authenticity" of Facebook messages may be established by showing that "the purported sender respond[ed] to an exchange in such a way as to indicate circumstantially that he was in fact the author of the communication." *Smith v. State*, 136 So. 3d 424, 433 (¶21) (Miss. 2014).

¶9. Here, in Jones's presence, Baker exchanged Facebook messages with a "Rudy Falcon," whose profile picture appears to be a picture of Falcon.[4] Baker testified that he regularly communicated with Falcon in this manner. In the subject exchange, Baker stated that he needed to see Falcon because he "need[ed] a ball," i.e., an eight-ball of methamphetamine. Falcon did not respond directly to Baker's request for "a ball" but invited Baker over to see his new speakers. Baker testified that when he arrived at Falcon's house about twenty minutes later, Falcon sold him an eight-ball—promptly and without further discussion—and showed him some new speakers. In other words, Falcon responded to Baker's arrival "in such a way as to indicate circumstantially that he was in fact the" same person who had exchanged Facebook messages with Baker just twenty minutes earlier. *Id.* at 433 (¶21). This was sufficient evidence for the jury to find that Falcon sent the messages.[5]

---

[4] Given the relative ease with which social media evidence can be fabricated, "more than a simple name and photograph" is needed "to sufficiently link the communication to the purported author under Rule 901." *Smith*, 136 So. 3d at 433 (¶21). As we explain, "more" was presented in this case through Baker's testimony.

[5] In *Smith*, the Supreme Court held that the trial judge abused his discretion by admitting Facebook messages because the State presented *no* competent evidence, direct or circumstantial, that the defendant sent the messages. *Smith*, 136 So. 3d at 434-35 (¶¶24-26) & n.14. Here, in contrast, Falcon's subsequent interaction with Baker provided circumstantial evidence that Falcon sent the messages.

Therefore, the trial judge did not abuse his discretion by admitting the messages.

¶10.   To be sure, Baker's testimony was not conclusive or ideal evidence of authenticity. But, again, Rule 901 does not require conclusive or ideal proof.  The State was not required to "rule out the possibility" that "someone other than" Falcon sent the messages.  *Garcia*, 2020 WL 2487383, at *20 (¶95).  The State's burden was to produce evidence sufficient for a reasonable juror to find that Falcon sent the messages.  M.R.E. 901.  Ultimately, whether Falcon sent the messages was a factual issue for the jury—not the trial court or this Court—to decide.  *Garcia*, 2020 WL 2487383, at *20 (¶95).  The trial judge admitted the messages after determining that there was enough evidence for the jury to find that Falcon sent them.[6]  That determination is "left to the discretion of the trial judge" and "will be upheld unless it can be shown that he abused his discretion."  *Ragin*, 724 So. 2d at 903 (¶7).  We cannot say that the trial judge abused his discretion in this case.  Therefore, Falcon's only assignment of error is without merit.

¶11.   **AFFIRMED.**

   **BARNES, C.J., CARLTON, P.J., GREENLEE, LAWRENCE AND McCARTY, JJ., CONCUR.   WESTBROOKS, J., CONCURS IN RESULT ONLY WITH**

---

   [6] Falcon also argues that the trial judge erred when he stated, "[Baker] testified that [Facebook] was the way he made contact with Mr. Falcon for I believe he said sixteen years."  Baker actually testified that he had "known" Falcon for about sixteen years and that "[f]or as long as [he could] remember," they "usually" communicated via Facebook.  Baker did not say that he and Falcon had used Facebook Messenger for sixteen years.  However, the judge's misstatement was immaterial.  The judge's only point was that there was evidence that the two men "regularly communicate[d] . . . through this method."  The precise number of years they had used Facebook Messenger was not important.  Moreover, the judge ultimately ruled that there was sufficient evidence of authenticity based on the consistencies and the short time lapse between the Facebook conversation and Baker's subsequent interaction with Falcon.

**SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**

**WESTBROOKS, J., CONCURRING IN RESULT ONLY:**

¶12. Because the Facebook messages purportedly sent from Falcon to Baker were not properly authenticated, I concur with the majority opinion only in its result. The Facebook messages were not properly authenticated by way of circumstances peculiar to this particular case. The majority finds that Falcon's interactions with Baker during the controlled buy indicate—at least circumstantially—that he was in fact the author of the communication. The State references the video as proof that Falcon (1) discussed and showed Baker the speakers mentioned in the Facebook correspondence; (2) actually sold Baker "a ball" of methamphetamine as agreed upon in the Facebook messages; and (3) was not surprised by Baker's arrival to purchase the drugs because of their Facebook conversation. Having reviewed the video and photographic evidence, I disagree.

¶13. The issue of authenticating social media correspondence is a fairly novel one, which the Mississippi Supreme Court first addressed in *Smith v. State*, 136 So. 3d 424 (Miss. 2014). In *Smith*, the Court discussed the unique nature of social media messages and the equally unique challenges of authenticating the messages for evidentiary purposes. *Id*. at 432-33 (¶¶18-19).

¶14. Mississippi Rule of Evidence 901 requires authentication of evidence as a requisite condition to its admission. Generally, Rule 901 provides that to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce "evidence sufficient to support a finding that the matter in question is what its proponent claims." In

7

*Smith*, the Supreme Court recognized that concern over authentication arises "because anyone can create a fictitious account and masquerade under another person's name or can gain access to another's account by obtaining the user's username and password, and, consequently, the potential for fabricating or tampering with electronically stored information on a social networking sight is high, and poses challenges to authenticating printouts from the website." *Id.* at (¶19) (internal quotation marks omitted). "[A]n electronic communication, such as a Facebook message, could be generated by someone other than the named sender[.]" *Id.* (quoting *State v. Eleck*, 23 A.3d 818, 822 (Conn. App. Ct. 2011)). "Facebook presents an authentication concern that is twofold." *Id.* (quoting *Campbell v. State*, 382 S.W.3d 545, 550 (Tex. App. 2012)). "First, because anyone can establish a fictitious profile under any name, the person viewing the profile has no way of knowing whether the profile is legitimate." *Id.* at 432-33 (¶¶19-20). Second, "because a person may gain access to another person's account by obtaining the user's name and password, the person viewing communications on or from an account profile cannot be certain that the author is in fact the profile owner." *Id*. at 432 (¶19).

¶15. Taking these concerns into account, the Mississippi Supreme Court found that "the fact that an electronic communication on its face purports to originate from a certain person's social networking account is generally insufficient standing alone to authenticate that person as the author of the communications." *Id*. at 433 (¶20). Ultimately, the Supreme Court held that "the ease with which defendants and alleged victims alike could fabricate a social media account to corroborate a story necessitates more than a simple name and photograph to

8

sufficiently link the communication to the purported author under Rule 901." *Id*. at (¶21).

¶16.    "A heightened level of authentication is required for electronic evidence in order to satisfy the trial court that the factfinders will receive reliable evidence." *Greene*, 282 So. 3d 645, 649 (¶19) (Miss. Ct. App. 2019) (citing *Smith*, 136 So. 3d at 433 (¶21)).  To facilitate adequate authentication of Facebook messages and other social media correspondence, the Court set forth a non-exhaustive list of how these unique communications may be authenticated:

> [(1)] the purported sender admits authorship, [(2)] the purported sender is seen composing the communication, [(3)] business records of an internet service provider or cell phone company show that the communication originated from the purported sender's personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have access to the computer or cell phone, [(4)] the communication contains information that only the purported sender could be expected to know, [(5)] the purported sender responds to an exchange in such a way as to indicate circumstantially that he was in fact the author of the communication, or [(6)] other circumstances peculiar to the particular case may suffice to establish a prima facie showing of authenticity.

*Id*. at 433 (¶21).

¶17.    The majority relies on the Mississippi Supreme Court's recent decision in *Garcia v. State*, No. 2017-DP-00504-SCT, 2020 WL 2487383, at *19 (¶¶90-92) (Miss. May 14, 2020), *motion for reh'g filed*, No. 2017-DP-00504-SCT (Miss. June 29, 2020), where Garcia asserted that the State failed to properly authenticate incriminating "electronic searches indisputably conducted on [his] electronic device [an Xbox 360]" under Rule 901.  Garcia argued that the searches at issue were tantamount to "communication purporting to originate from [a] social media account." *Id*. at (¶91).  The Court rejected Garcia's contention, citing

caselaw specific to the authentication of *internet searches* and again emphasized that "the primary concern in *Smith* was the potential for fabrication—that is, creating a fake social-media account using someone else's name and masquerading as that person." *Id*. at (¶¶91-92).

¶18. The Supreme Court further held that the "State was not required to rule out the possibility that the internet searches [admitted into evidence] could have been conducted by someone other than [the defendant]" because "the possibility that some of the searches . . . could have been conducted by someone else besides Garcia goes to the weight of this evidence, not its authenticity." *Id*. at *20 (¶¶93-95). In Falcon's case, the authentication of social media messages, not their weight, is the primary issue.

¶19. As *Garcia* highlights, the *Smith* Court "surmised that a social-media message potentially could be authenticated by evidence 'that the communication originated from the purported sender's personal computer . . . ,'" but the current facts do not allow for such an authentication. *Id*. at *19 (¶92) (quoting *Smith*, 136 So. 3d at 433 (¶21)). Officers did not recover the device from which the messages purportedly sent by Falcon originated, nor did they subpoena Facebook to gather information that would identify the device—both unseized opportunities to authenticate the purported messages from Falcon.

¶20. Here, Falcon claims that the State failed to prove that he was the party on the other end of Baker's Facebook correspondence—through direct or circumstantial evidence. As noted, Falcon's phone was not seized in the arrest, nor were Facebook's records subpoenaed. In fact, the State offered no direct evidence other than the name "Rudy Falcon" listed on the

10

Facebook account—which the Supreme Court has expressly held as insufficient to prove Falcon was the account holder and certainly inadequate as evidence of his participation in the conversation. *Smith*, 136 So. 3d at 433 (¶20). The State's circumstantial evidence supported by video recording of the exchange between Falcon and Baker revealed that Baker, not Falcon, made mention of the speakers upon entering Falcon's home; no audible response from Falcon was captured; however, Baker does clearly engage in extended conversations with the other two individuals present in the home.

¶21. Accordingly, and for the reasons stated above, I would find that the trial court erred by allowing the State to admit the Facebook messages as evidence.

**McDONALD, J., JOINS THIS OPINION.**